Filed 7/5/13  P. v. Dominguez CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D060019 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD230596) |
| FLORENCIO JOSE DOMINGUEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Bernard E. Revak* and Charles G. Rogers, Judges.  Affirmed.

Patrick Morgan Ford, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel and Scott C. Taylor, Deputy Attorneys General, for Plaintiff and Respondent.

---

*     Retired judge of the San Diego Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Following a mistrial and the subsequent dismissal of his murder charge, the jury in defendant Florencio Jose Dominguez's second trial convicted him of first degree murder (Pen. Code,[1] § 187, subd. (a); count 1) and conspiracy to commit murder (§§ 182, subd. (a)(1), 187; count 2). The jury also made true findings Dominguez or a principal used a firearm causing the death of another person (§ 12022.53, subds. (d) & (e)(1)), and he committed counts 1 and 2 for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)). The trial court sentenced Dominguez to 25 years to life on count 1 and imposed a consecutive 25-years-to-life enhancement for the firearm allegation. Sentences on the remaining count and allegations were stayed.

Dominguez contends double jeopardy barred his retrial in the second case after the jury deadlocked and the court expressly dismissed without prejudice the first case. Alternatively, Dominquez contends his conviction must be reversed because the court (i) prejudicially erred in connection with a series of evidentiary rulings and (ii) improperly responded to a question posed by the jury during its deliberations.

As we explain, we disagree with these contentions and affirm Dominquez's judgment of conviction.

### FACTUAL AND PROCEDURAL BACKGROUND[2]

This case involves the Shelltown 38th Street gang from the Shelltown

---

[1] Statutory references are to the Penal Code unless otherwise noted.

[2] We view the evidence in the light most favorable to the judgment of conviction. (See *People v. Osband* (1996) 13 Cal.4th 622, 690.) Portions of the factual and procedural history related to the contentions raised by Dominguez are discussed *post*.

neighborhood of southeast San Diego (Shelltown gang). The Shelltown gang territory includes Mountain View Park, also known as Ocean View Park (collectively, the park). Both Dominguez, whose gang monikers are "Speedy" and "Chunky," and the murder victim in this case, Moises Lopez, whose gang moniker was "Smokey," were members of the Shelltown gang, as was Edwin "Little Crooks" Quintanilla, the victim of an earlier fatal shooting connected with Moises's murder.

In early July 2008, Edwin was with Moises and another Shelltown gang member when a rival gang member approached. Edwin challenged the rival gang member who, in response, pulled out a gun. Moises and the other Shelltown gang member ran. The rival gang member then fatally shot 17-year-old Edwin. Two days after Edwin was killed, police interviewed his sister, Marla Quintanilla. Marla stated during the interview Dominguez had told her he was "gonna get them little dudes because . . . they [left her] brother there [lying] down."

In the evening of September 13, 2008, several people heard gunshots coming from the park. Magdalena Lopez and her daughter Jessica were driving home sometime after 8:00 p.m. that night when Magdalena saw a group of young men gathered in the park. Magdalena's home faced the park.

Magdalena testified a little while later she went outside after she heard screams coming from the park. She next heard and saw two people arguing in the park. The argument turned physical. Magdalena saw a man in dark clothing repeatedly strike a "young man" laying on the ground. The man in dark clothing left and walked up a hill.

3

Magdalena next saw two other men approach the victim, and they too began beating him. After a few minutes, the men picked up the victim and dragged him up the hill where the man in dark clothing waited. The three men huddled around the victim. Shortly thereafter, the two men moved away, leaving the man in the dark clothing closest to the victim.

Magdalena testified initially she thought the three men were going to leave the victim alone. However, she saw the man in dark clothing "raise[] his hand [and then] lower[] it . . . like he was pointing" at the victim. Magdalena then thought, "'Oh, my God'" as she heard a gunshot and saw "fire" coming from the gun as it was discharged. Magdalena heard at least two more gunshots as she ran inside the house.

Jessica testified around 9:00 p.m. on the night of the shooting she heard screaming coming from the park. Jessica looked out the kitchen window and saw a man in the park in dark clothing hitting another man. Jessica estimated the beating lasted about two or three minutes. When interviewed by police, Jessica reported hearing the man in dark clothing say to the victim in English, "I'm going to kill you." Jessica also saw two other men beat the victim. A few minutes later, she saw the two men drag the victim up a hill. Jessica saw the man in dark clothes standing near the victim and gesture as if he was pointing a gun at the victim. Next, she testified she heard five gunshots. Jessica saw some of the shots being fired and heard the others as she was calling police a second time.

4

Meliton Puente testified on the night of the shooting he was living in a residence adjacent to the park. As he was inside watching television, he heard at least three gunshots. Meliton went outside and from his porch saw two police officers. One of the officers had his gun drawn. Meliton saw two Hispanic women and a Hispanic man leaving the park; he described the man as bald, between the ages of 22 to 25 and wearing a white T-shirt. Meliton testified the man appeared to be trying to hide "something."

Meliton testified he next walked into the park and approached a police officer who was attempting to speak with a young man that had been shot. The victim was screaming and crying.

Meliton's son, Julio Ramirez, testified that about 8:00 p.m. on the night of the shooting, he was listening to music while sitting in his car, which he had parked across the street from his family residence. Suddenly, Julio saw a green car driven by a female pull up behind him. The female and her male passenger got out of the car and started arguing. The male passenger was muscular, wore a white T-shirt and black tank top, and was bald. Concerned, Julio got out of his car and starting walking toward his home. He saw the female and male walk up a "dirt hill." Julio also saw two other cars pull up behind the green car. There were two men in each car. About 10 minutes later, Julio heard gunshots coming from the park. He went outside as police were arriving on the scene.

Hesneyda Buendia testified at the time of the shooting she lived in a house adjacent to the park. Hesneyda was not home on the night of the shooting. However,

5

early the next day following the shooting, she found a white T-shirt stained with blood hanging off a wall in her yard and blood drops on her patio. Hesneyda notified police.

About 9:30 p.m. the night Moises was murdered, San Diego Police Officers Samuel Euler and Michael Weaver responded to a call of people fighting in the park. When they arrived, they heard four or five gunshots ring out. The officers cautiously approached a young man later identified as Moises laying on the ground in the park. Moises was having difficulty breathing, had gunshot wounds to his right and left torso, and had marks on the back of his head consistent with blunt-force trauma.

Officer Kelvin Lujan also responded to a report of gunfire in the park. Officer Lujan came upon the victim in the park, later identified as Moises. In addition to telling Officer Lujan his name and age, the victim in response to the officer's repeated question said,"'I don't know who shot me.'" Moises was 15 years old at the time he died. He was shot five times, and the fatal shot went into his left lung and through his heart.

Police found a 12-pack of beer near the site of the murder. A half-full bottle was sitting on top of the pack; condensation on the bottle indicated it was cold. Police also found at least four beer cans near a green car stopped in an alley adjacent to the park. The headlights of the car were left on, and its rear doors were wide open. Police also found a pair of bloody black gloves in the yard of a residence near the park.

About seven months after the murder, police arrested 14-year-old Andres L. for tagging. Andres identified himself as "Stalker" from the Shelltown gang and identified Dominguez as "Speedy" from that same gang. During the police interview, Andres told

6

police he was at the park on the night of the shooting and saw Dominguez shoot and kill Moises. Andres explained Speedy had killed Moises for running away when Edwin, Moises and another Shelltown gang member were confronted by a rival gang member, who ended up killing Edwin. This interview was played for the jury.

At trial, Andres testified he initially lied during the police interview but later told the officers the truth. Andres also testified he was concerned about being a "snitch" and fearful he would get a "green light," which meant the gang would try and kill him for snitching to the police about the murder. He testified while he was in fourth and fifth grade he was enrolled in special education classes because it was hard for him to learn things; he dropped out of school in the sixth grade and started "kicking it" with members of the Shelltown gang, which included drinking beer and smoking marijuana.

Andres testified before he went to the park on the day Moises was murdered, he consumed two or three 40-ounce beers and smoked about four grams of marijuana with other Shelltown gang members. As it was getting dark, Andres saw other Shelltown gang members in the park, including Dominguez and Moises. Andres continued to drink beer and smoke marijuana in the park with other Shelltown gang members.

Andres testified while he was urinating in the park he heard a gunshot, looked over his shoulder and saw "Speedy" (i.e., Dominguez) shoot "Smokey" (i.e., Moises) as Smokey lay on the ground. Andres said there were two other Shelltown gang members nearby when Speedy shot Moises.

7

Andres testified there were bright lights above the trees and lights near the bathrooms in the park. Andres heard more gunshots as he ran and hid in a concrete sewer about two blocks away from the park.

Natalie Elias testified she heard at least five gunshots coming from the park on the night of the murder. Natalie saw two people running out of the park. She described one of those persons as Hispanic, bald and in his late twenties, who wore a white tank top shirt and blue jeans. The other person jumped the fence in her yard, saw Natalie and asked if he could hide at her house. Natalie described this second person as a young man in his teens, who wore a dark shirt, blue jeans and a hat.

Glennys Berumen testified she and Moises went to the same high school and dated for about a year before his murder. Glennys stated after Moises's death, Moises's friend, Josue Gutierrez, approached her as she was walking in the park. Glennys testified she had known Josue since elementary school, he was a Shelltown gang member who went by the moniker "Scrappy" and, at that time, she considered Josue to be her "friend."

According to Glennys, Josue was drinking a beer, appeared "kind of drunk" and began to cry as he told her he was in the park on the night Moises was murdered, saw "Speedy" beat and shoot Moises, and then saw Speedy leave the park in a car driven by Siria Ford, whose boyfriend, Vandal, was also a member of the Shelltown gang. Josue also told Glennys he saw "Stalker" (i.e., Andres) in the park at the time of the killing.

Glennys testified Josue also told her Josue and Moises had been at a barbecue on the day of the shooting and, at the barbecue, Dominguez and Moises argued about

8

Edwin's death. Glennys said she and Josue are no longer friends because of threats (discussed *post*) she received prior to her testimony.

Josue testified he was not a gang member, he did not know Glennys and he did not tell anyone, including her, that he had seen Dominguez shoot Moises. Josue also testified he was not at the park on the night of the shooting but instead was at a quinceanera party near the park.

Dominguez's DNA was found on two beer bottles near the murder site. Moises's DNA was found on the black gloves police recovered from the yard near the park. The insides of the gloves were tested for the retrial and found to contain a mixture of DNA from at least four individuals, with Moises being a major contributor to the mixture. Dominguez and Josue were also identified as possible minor contributors to the mixture.[3]

DISCUSSION

A. *Double Jeopardy*

Dominguez contends double jeopardy barred his second trial because Judge Jeffrey Fraser, who presided over the first trial, dismissed the case allegedly because the evidence was insufficient as a matter of law to support a murder conviction.

---

[3] The defense's case consisted of the testimony of Dominguez, among other witnesses, including experts. The People also offered rebuttal evidence. To the extent any of this evidence is relevant to the issues Dominguez raises on appeal, it will be discussed in the context of those issues as we previously indicated in footnote 2, *ante*.

9

1. *Brief Additional Background*

After the jury deadlocked nine to three in favor of acquittal in the first trial (Super. Ct. San Diego County, No. SCD225579), Judge Fraser declared a mistrial and dismissed the case *without prejudice*. In so doing, the court ruled in part as follows:

"Well, this is a tough call because a 15-year-old boy was executed in a park. [¶] The evidence shows the defendant is, in fact, the shot-caller for Shelltown. There is no question about that. He has a double life. He's a good employee and a dad and a husband; but he also has a girlfriend and is an active gang member, in fact, probably the head of that gang. There is no question he was in the park. He was around the murder. We're not talking 50 feet away. We're talking near the murder. There is a cold beer that indicates that. So he did it, or he obviously knows who did.

"The question in this case, though, is one of did the D.A. meet their burden? That's the question. I put aside the evidence the defense put on because the defense evidence simply confirmed the fact that he's the shot-caller for Shelltown. The question, is as I indicated before, did the D.A. meet their burden with Lopez, Zepeda or the DNA? *And any of those individually would be enough, perhaps, to prove beyond a reasonable doubt; and together you would think they would be, but we have nine people that essentially said the D.A. failed to meet their burden.*

"That's what this case is all about. It is about the D.A. meeting his burden of proof, which is beyond a reasonable doubt. He [the prosecutor] has shown by a preponderance the defendant is the murderer. He has even probably shown by clear and

10

convincing evidence the defendant is the murderer. *At this point* he has failed to meet -- I agree with the nine jurors. If I was to sit and make a call on this case without a jury, I think the D.A. has failed to meet their burden *at this point in time*. Based on that, I'm going to dismiss this case . . . *without prejudice*. There may come a time in the future when someone else comes forward to say, either the defendant or someone else. Because the defendant, if he didn't pull the trigger, he knows who did. He's standing right there. It may be somebody else, but based on the current state of the evidence, that can't be proven. And so at this point the matter is dismissed *without prejudice*." (Italics added.)

The minute order stated the trial court denied the prosecution's motion to retry the case, showed the defense brought a motion to dismiss the case under section 1385[4] and stated the case was dismissed without prejudice. However, the minute order did not state the reason for the dismissal.

The prosecution refiled the criminal complaint (Super. Ct. San Diego County, No. SCD230596). Dominguez in response filed a demurrer pursuant to section 1004, contending double jeopardy barred the refiled complaint because the court in the first trial had dismissed the case against him for "lack of evidence." The demurrer was assigned to Judge Bernard Revak. The record shows the court continued the hearing on the demurrer because it needed additional time to review the pleadings, the demurrer and the

---

4      Although a defendant is not entitled to move for dismissal in the furtherance of justice under section 1385 (see fn. 6, *post*), a defendant may "'invite the court to exercise its power'" to do so. (*People v. Carmony* (2004) 33 Cal.4th 367, 375.)

11

opposition to the demurrer, the applicable legal authorities and to read the relevant transcripts from the first case.

In overruling the demurrer, Judge Revak ruled in part as follows:

"I think in reading what Judge Fraser did, what is important to me is not so much what he said as what he didn't say. And taking a look at [*People v.*] *Hatch* and some of the other cases that have interpreted this situation, he [Judge Fraser] never said that there was legally insufficient evidence. And I think the cases discuss that language. And obviously, there are grounds for which a [section] 1385 could be ruled on and could be made and would bar a retrial. But that wasn't said by the Judge. And so he did not find that there was no substantial evidence upon which a trier of fact could find the defendant guilty beyond a reasonable doubt or that there was legally insufficient evidence. Had he said that, then I think the dismissal would bar a retrial.

"As I understand further the law, the District Attorney gets one bite out of the apple, so to speak. Meaning that if there's one dismissal, they can refile unless the judge who grants it finds that[] there's legally insufficient evidence or that the prosecution has engaged in serious or outrageous misconduct or that a retrial is meant to harass a defendant. And none of these were broached or discussed by the trial judge [in the first case]. And I don't think that, based on this entire record in this case, he made such a finding. So I think the two dismissal rule applies. The district attorney has now used up

12

one. The second dismissal of this case would bar a retrial. And so I'm going to deny the demurrer or alternatively any similar motion on jeopardy grounds."[5]

2. *Governing Law*

"The Fifth Amendment to the United States Constitution provides that '[n]o person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb . . . .' This guarantee is applicable to the states through the Fourteenth Amendment. [Citations.] Similarly, article I, section 15, of the California Constitution provides: 'Persons may not twice be put in jeopardy for the same offense . . . .'" (*People v. Saunders* (1993) 5 Cal.4th 580, 592-593; see also *Stanley v. Superior Court* (2012) 206 Cal.App.4th 265, 278.)

In the trial context, the core protection of the double jeopardy clause is the prohibition of a retrial after an acquittal. (*Dowling v. United States* (1990) 493 U.S. 342, 355.) An acquittal most often results when a jury returns a not guilty verdict. However, as relevant here, an acquittal for double jeopardy purposes can also occur when a trial court grants a defendant's new trial motion for insufficient evidence. (See *Hudson v. Louisiana* (1981) 450 U.S. 40, 44; *People v. Lagunas* (1994) 8 Cal.4th 1030, 1038, fn. 6.) Although uncommon, an acquittal for double jeopardy purposes can occur when a trial

---

[5] After his demurrer was overruled, Dominguez filed a petition for writ of mandate, which this court denied without comment. (*Dominguez v. Superior Court* (Feb. 4, 2011, D058906).)

13

court dismisses a case pursuant to section 1385[6] if it determines the evidence to convict is insufficient as a matter of law. (*People v. Hatch* (2000) 22 Cal.4th 260, 273 (*Hatch*).)

In *Hatch*, after the jury deadlocked on all counts, the trial court declared a mistrial and dismissed the case pursuant to section 1385. In so doing, the trial court stated in the minute order it was dismissing the case because "'no reasonable jury would convict the defendant of the charges alleged in the information based on the evidence presented in court.'" (*Hatch*, *supra*, 22 Cal.4th at p. 266.) In response, the People refiled the same criminal charges and added nine new counts based on the same incident between the defendant and a 16-year-old minor, in which the minor claimed she had been sexually assaulted by the defendant. (*Id.* at pp. 264, 266-267.)

The defendant filed a petition for habeas corpus in the trial court, arguing the second prosecution was barred on double jeopardy grounds. The petition was assigned to a different judge from the judge that presided over the prosecution of the first case. The court granted the petition because "'there was not sufficient evidence to convict the defendant.'" (*Hatch*, *supra*, 22 Cal.4th at p. 267.) The Court of Appeal affirmed the order granting the habeas petition, ruling the "dismissal was equivalent to an acquittal for legal insufficiency of the evidence" and as such, "barred retrial." (*Ibid.*)

---

6    Section 1385 reads in pertinent part: "(a) The judge . . . may, either of his or her own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed. The reasons for the dismissal must be set forth in an order entered upon the minutes."

Our high court in *Hatch* reversed. It ruled a dismissal pursuant to section 1385 could not be construed as an acquittal for legal insufficiency unless the record "clearly" indicated a court dismissed the case because the evidence was "insufficient as a matter of law." (*Hatch*, *supra*, 22 Cal.4th at p. 273.) Because the record in the case before it did not so indicate, as the minute order merely stated that "'no reasonable jury would convict . . . based on the evidence presented in court,'" the court held retrial of the defendant was permitted. (*Id.* at p. 274.)

The reasoning and holding of *Hatch* govern the instant case. In reaching its decision, the court in *Hatch* noted: "[T]he United States Supreme Court has long held that 'what constitutes an "acquittal" is not to be controlled by the form of the judge's action.' [Citation.] Rather, appellate courts 'must determine whether the ruling of the judge, whatever its label, actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged.' [Citation.] If a trial court rules the evidence is insufficient as a matter of law, then the ruling bars retrial even if it is patently erroneous or the court has no statutory authority to make it. [Citations.] . . . [¶]

". . . Over 20 years ago, the United States Supreme Court held that the Fifth Amendment precludes retrial if a court determines the evidence at trial was insufficient to support a conviction as a matter of law. [Citation.] Thus, an appellate ruling of legal insufficiency is functionally equivalent to an acquittal and precludes a retrial. [Citation.] An analogous trial court finding is also an acquittal for double jeopardy purposes. [Citations.] Where a court merely 'disagrees with a jury's resolution of conflicting

15

evidence and concludes that a guilty verdict is against the weight of the evidence,' however, a reversal or dismissal on that ground does not bar retrial. [Citation.]

"We have interpreted the double jeopardy clause of the California Constitution in a similar manner. Because the standard for determining the legal sufficiency of evidence is the same under both federal and California law, the 'rule of *Burks* [*v. United States* (1978) 437 U.S. 1] applies to trials conducted in our courts.' [Citation.] We have also held that the reversal of a conviction based on a reweighing of evidence does *not* bar retrial under the California Constitution. [Citations.]

"In applying these principles, we have not distinguished between trial and appellate court determinations of legal insufficiency because both courts must apply the substantial evidence standard when making this determination. [Citations.] Specifically, both trial and appellate courts must review 'the whole record in the light most favorable to the judgment' and decide 'whether it discloses substantial evidence . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] Under this standard, the court does not '"ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." [Citation.] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.]

"Although a trial court may apply the substantial evidence standard when dismissing pursuant to section 1385, it usually does not. Indeed, the standard for

16

dismissal under section 1385 is quite broad and permits dismissal under a variety of circumstances. For example, a court may dismiss under section 1385 if it believes 'the only purpose to be served by a trial or a retrial is harassment of the defendant . . . notwithstanding the fact that there is sufficient evidence of guilt, however weak, to sustain a conviction on appeal.' [Citation.] Thus, a section 1385 dismissal may not even 'involve a consideration of the merits of the cause.' [Citation.]

"Because section 1385 dismissals often are not based on the insufficiency of the evidence as a matter of law, we believe these dismissals should not be construed as an acquittal for legal insufficiency unless the record clearly indicates that the trial court applied the substantial evidence standard. Specifically, the record must show that the court viewed the evidence in the light most favorable to the prosecution and concluded that no reasonable trier of fact could find guilt beyond a reasonable doubt. [Citation.] Absent such a showing, we will assume the court did *not* intend to dismiss for legal insufficiency and foreclose reprosecution.

"In doing so, we do not intend to impose rigid limitations on the language trial courts may use to dismiss for legal insufficiency of the evidence pursuant to section 1385. Certainly, courts need not restate the substantial evidence standard or use certain 'magic words' whenever they determine that the evidence is insufficient as a matter of law. We merely ask trial courts to make their rulings clear enough for reviewing courts to confidently conclude they viewed the evidence in the light most favorable to the prosecution and found that no reasonable trier of fact could convict.

17

"This simple request properly balances the competing interests embodied in the constitutional prohibitions against double jeopardy. Although repeated prosecutions unfairly burden a defendant and increase the risk of conviction through sheer perseverance, 'a defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments.' [Citations.] For example, this right does 'not have the same force' when there is sufficient evidence to support a conviction. [Citation.] In that case, retrial simply 'affords the defendant a second opportunity to seek a favorable judgment' and does not violate the constitutional prohibitions against double jeopardy. [Citation.] By barring retrial only when a trial court clearly makes a finding of legal insufficiency, we remain faithful to these governing principles. [Citation.] Our decision also reduces the likelihood of future confusion over the effect of a section 1385 dismissal by creating an incentive for parties to seek clarification at the time of dismissal.

"Applying this rule to these facts, we conclude retrial is permitted because the record does not clearly show an intent by the trial court to dismiss for legal insufficiency of the evidence. Our analysis begins with the trial court's minute order—which merely states that 'no reasonable jury would convict . . . based on the evidence presented in court.' (See § 1385 ['The reasons for the dismissal must be set forth in an order entered upon the minutes'].) This order does not indicate that the court viewed the evidence in the light most favorable to the prosecution. Moreover, the use of the word 'would' rather than 'could' suggests a reweighing of evidence rather than an application of the

18

substantial evidence standard.  [Citation.]  Taken together, these ambiguities make it impossible for us to conclude that the court intended to dismiss for lack of sufficient evidence as a matter of law.

"The reporter's transcript bolsters our conclusion.  [Citation.]  Like the minute order, nothing in the reporter's transcript indicates the trial court viewed the evidence in the light most favorable to the prosecution.  Rather, the court's inquiries about additional evidence and its remarks on the quality of the trial presentations and the apparent pro-prosecution bent of the jury suggest an assessment of the strength of the evidence.  The court's comments on the improbability of an unanimous verdict of guilt do not suggest otherwise.  Indeed, the mere likelihood of disagreement among rational [jurors] 'is not in itself equivalent to a failure of proof by the State . . . .'  [Citations.]  Accordingly, we decline to construe the section 1385 dismissal in this case as an acquittal for double jeopardy purposes."  (*Hatch*, *supra*, 22 Cal.4th at pp. 270-275, fns omitted.)

3.  *Analysis*

Despite the requirement under section 1385 that the reason for dismissal be set forth in an order entered upon the minutes, the trial court in the instant case gave no such reason.  Instead, the minute order merely provides the case is dismissed "without prejudice."

In any event, Black's Law Dictionary defines the term "dismissal without prejudice" to mean a "dismissal that does not bar the plaintiff from refiling the lawsuit within the applicable limitations period."  (Black's Law Dict. (9th ed. 2009) p. 537, col.

19

1.) The term "without prejudice" is further defined to mean "[w]ithout loss of any rights; in a way that does not harm or cancel the legal rights or privileges of a party." (*Id.* at p. 1740, col. 1.)

Relying on *Hatch*, as we must, we conclude from the plain meaning of the words "dismissal without prejudice" and "without prejudice" that the trial court in the first case did *not* intend to foreclose the People from retrying Dominguez for the murder of Moises. Indeed, if the court had intended to preclude retrial, at a minimum it would have dismissed the case "with prejudice." In any event, there is no language in the minute order that the court viewed the evidence in the light most favorable to the prosecution (see *Hatch, supra*, 22 Cal.4th at p. 274) and, if so, that it *unambiguously* found the evidence to convict insufficient as a matter of law (see *ibid.*). In our view, the language of the minute order unambiguously states the intent of the court not to preclude retrial.

The transcript from the dismissal hearing supports our conclusion. The court commented on the record that either Andres's testimony or the DNA evidence "perhaps" would be sufficient to prove beyond a reasonable doubt that Dominquez murdered Moises, but that one "would think" this evidence, when considered together, would be sufficient to convict.[7] These comments do not suggest, much less unambiguously, that the court found as a matter of law the evidence insufficient to convict Dominguez for the

_____

[7]    The court also noted the testimony of Daniel Zepeda alone would be sufficient to prove beyond a reasonable doubt that Dominguez murdered Moises. Daniel, who did not testify at the second trial, told police during an interview he was at the park on the night of the shooting, as was "Speedy" (i.e., Dominguez), and he saw his friend Moises get shot. At the first trial, however, Daniel testified he could not remember any of these details or many others he previously had told police.

20

murder of Moises. (See *Hatch*, *supra*, 22 Cal.4th at p. 273.) Instead, these comments show the trial court was merely assessing the evidence—much like a 13th juror. (See *People v. Salgado* (2001) 88 Cal.App.4th 5, 10 [noting that double jeopardy does not preclude retrial "when a dismissal is based on the trial court's reweighing of the evidence as a 'thirteenth juror,'" as opposed to a dismissal based on legal insufficiency of the evidence].)

We reach the same conclusion for the same reasons with respect to the comment by the trial court that it agreed with the nine jurors who voted to acquit. Again, this comment merely shows the court was assessing the evidence, not making a legal determination regarding the sufficiency, or lack thereof, of the evidence. (See *People v. Salgado*, *supra*, 88 Cal.App.4th at p. 10.) We also note the jury in *Hatch* voted 11 to one to acquit on count 1, 10 to two to acquit on count 2 and nine to three to acquit on count 3. (*Hatch*, *supra*, 22 Cal.4th at p. 266, fn. 2.) Nonetheless, our high court in *Hatch* held retrial of the defendant on these counts was permissible.

In addition, we note that when the trial court stated it agreed with the nine jurors to acquit, it added the caveat that the People "at this point in time" had not satisfied the prosecution's burden of proof. We conclude the use of the words *at this point in time*—which was repeated several times by the trial court—is similar to the use of the word "'would' rather than 'could'" that our high court in *Hatch* found "suggest[ed] a reweighing of evidence rather than an application of the substantial evidence standard." (*Hatch*,

*supra*, 22 Cal.4th at p. 274.)  Our conclusion is buttressed by the fact the trial court coupled the words "at this point in time" with the words "without prejudice."

We thus reject Dominquez's contention that double jeopardy principles barred his retrial.

B.  *Evidentiary Issues*

Dominguez does not challenge his murder conviction for lack of substantial evidence.  Nonetheless, he does challenge several evidentiary rulings made by the trial court, which we turn to next.

1.  *Admission of Josue's Out-of-Court Statements to Glennys*

a.  Additional Background

As noted *ante*, Glennys testified Josue approached her sometime after Moises's killing while she was walking in the park and told her he saw Speedy (i.e., Dominguez) first beat then kill Moises.  Glennys testified Josue also told her that he and Moises had been at a barbecue earlier on the day of the shooting and that at the barbecue, Dominguez and Moises had argued about Edwin's death.  Glennys testified Josue was crying when he made these statements to her.

Dominguez moved pretrial to exclude these statements.  The record shows their admissibility initially arose before a jury was empanelled, when the trial court and counsel were discussing when trial would start.  The defense noted if the court was inclined to exclude these statements, it wanted the trial to start the next day.  Otherwise, the defense stated it needed two additional weeks to conduct further investigation.

22

After argument by the People, the court framed the issue before it as follows: "So given the way these things play out, it would not be a stretch to expect that the People would call Mr. [Josue] Gutierrez, Mr. Gutierrez would say that he doesn't know anything about it and deny making these statements. The People would then seek to call Ms. Berumen under Evidence Code section 1235 and seek to use her testimony as substantive evidence."

Although recognizing the statements by Josue to Glennys after the murder were technically admissible under the Evidence Code, the defense in response argued they should be excluded under Evidence Code section 352 because they were inherently unreliable and because Glennys had "some credibility issues."

The trial court tentatively ruled to admit the statements, noting that in cases with "gang overtones . . . there are always conflicted loyalties and biases. Section 1235 of the Evidence Code was created for the so-called turncoat or rollover witness." The court further noted that typically a court does not consider the reliability of evidence in determining whether to admit or exclude evidence because "[r]eliability is really for the trier of fact to thrash out."

The court denied the defense's request to exclude the statements under Evidence Code section 352. In so doing, the court was "mindful" both of the seriousness of the charges and the fact the defense would have to conduct investigation, including perhaps calling witnesses "that say 'Mr. Gutierrez couldn't have seen those things because he was

23

with us in another location,' and the People may have some impeaching testimony from those witnesses. I'll decide where to draw that line when and if we get to it."

The defense again raised the issue of the admissibility of Josue's statements to Glennys in an in limine motion that sought, among other relief, a hearing pursuant to Evidence Code section 402.

As anticipated, after Josue testified he never spoke to Glennys about Moises's murder and, in fact, he did not even know Glennys, the People called Glennys as a witness. Outside the presence of the jury, the court held an Evidence Code section 402 hearing with respect to the limited issue of the "basis of knowledge of the hearsay declarant, Mr. Gutierrez," which the court noted was a "prerequisite to the admissibility of her testimony under [Evidence Code] section 1235."

After Glennys testified Josue told her that Josue "saw when Speedy [i.e., Dominguez] killed Moises" and after Glennys was subjected to cross-examination regarding an earlier inconsistent statement relevant to this issue, the court ruled as follows to admit the statements under Evidence Code section 1235:

"I think we need to do some balancing here. First of all, I find that although the evidence is disputed, there is sufficient basis to find personal knowledge on the part of the hearsay declarant, Mr. Gutierrez, to allow Ms. Berumen's testimony. [¶] Her testimony is proffered under section 1235 of the Evidence Code. It is a prior inconsistent statement under *California v. Green.* It's usable for the truth of the matter asserted

24

therein. The credibility of the hearsay declarant is always in issue, just as if the hearsay declarant was a witness.

"Mr. Gutierrez has already testified. He's been asked about these statements. He's denied knowing Ms. Berumen or even knowing that she was his friend's Moises' girlfriend at one point. I recall him saying, 'We don't talk about girls or girlfriends,' this almost in the same breath that he was going to crash the quinceanera to try to pick up girls.

"I do find that there is a sufficient basis to conclude that Mr. Gutierrez had personal knowledge and that his statements to Ms. Berumen are reliable to allow their admission . . . into evidence."

b. Governing Law and Analysis

Dominguez contends the trial court abused its discretion when it admitted Josue's statements to Glennys pursuant to Evidence Code section 1235 because the court allegedly failed to make a finding that Josue's statements were made as represented.

Evidence Code section 1235 provides: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his [or her] testimony at the hearing and is offered in compliance with Section 770."[8]

---

8    Dominguez does not contend the statements made by Josue to Glennys about Moises's murder were inadmissible under Evidence Code section 770, which provides: "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his [or her] testimony at the hearing shall be excluded unless: [¶] (a) The witness was so examined while testifying as to give him [or her] an opportunity to explain or to deny the statement; or [¶] (b) The witness has not been excused from giving further testimony in the action."

"When evidence is offered under one of the hearsay exceptions, the trial court must determine, as preliminary facts, both that the out-of-court declarant made the statement as represented, and that the statement meets certain standards of trustworthiness. [Citation.] The first determination—whether the declaration was made as represented—is governed by the substantial evidence rule. The trial court is to determine only whether there is evidence sufficient to sustain a finding that the statement was made. [Citation.] As with other facts, the direct testimony of a single witness is sufficient to support a finding unless the testimony is physically impossible or its falsity is apparent 'without resorting to inferences or deductions.' [Citations.] Except in these rare instances of demonstrable falsity, doubts about the credibility of the in-court witness should be left for the jury's resolution; such doubts do not afford a ground for refusing to admit evidence under the hearsay exception for statements against penal interest. [Citations.]" (*People v. Cudjo* (1993) 6 Cal.4th 585, 608-609.)

Here, we conclude there is ample evidence in the record to support the finding that Josue made the statements as represented by Glennys. Indeed, the record shows the trial court and the defense were concerned about whether Josue had personal knowledge of the killing of Moises or whether his knowledge was based on what others had told him. The record also shows Glennys was extensively examined and subject to cross-examination on this issue. At the conclusion of her testimony, the court determined there was sufficient evidence to show Josue did have personal knowledge.

In making this determination, the court necessarily found Josue made the statements attributed to him by Glennys, as the court also ruled such statements were sufficiently reliable to be admitted into evidence. (See *People v. Ledesma* (2006) 39 Cal.4th 641, 710 [noting that a "'ruling on the admissibility of evidence implies whatever finding of fact is prerequisite thereto'"].) We thus conclude the trial court properly exercised its discretion when it ruled to admit under Evidence Code section 1235 the out-of-court statements of Josue, as testified to by Glennys, which were inconsistent with Josue's trial testimony.

2. *Admission of Evidence that Glennys Was Threatened Before She Testified*

a. Additional Background

During the Evidence Code section 402 hearing, Glennys also testified about being threatened shortly before she was to testify. Glennys explained she at one time had been a member of the Shelltown gang, who went by the moniker "Downers," and her younger brother Humberto also had been a former Shelltown gang member, who went by the moniker "Rider." Humberto went to school with a girl named Angelina Campos. Angelina told Humberto at school she had a message from Josue that Glennys had better "watch [her] back and not . . . show up to court" and, if she did show up, that "everybody" from the Shelltown gang would be after her for being a "snitch." Glennys was scared by this threat and considered not testifying at the retrial. However, she ultimately decided to testify for the sake of her former boyfriend Moises.

The record shows the trial court found Glennys to be a credible witness and ruled as follows to admit the threat: "[N]umber one, I find the threats are relevant. Number two, I think there has to be a limiting instruction that says that there is no evidence that Mr. Dominguez was the source of these threats and the jury is not to draw any inference that he may have been behind or caused or the source of these threats, and I'll be happy to consider the exact formulation of it with input from both counsel.

"The balancing that I talked about is this: This is a gang case. It's a murder. Shelltown is a well-known, long-established criminal street gang, and I think the court has to recognize that the threats are something that this young girl who lives in that milieu will be susceptible to; therefore, it's important to get her testimony on when we can.

". . . I'm going to allow her testimony in its entirety at this time, and, if need be, I'll have her subject to recall if [defense counsel] then develops information from further follow-up investigation where further examination of her needs to occur."

The record shows that immediately after the People called Glennys as a witness, the court gave the jury the following limiting instruction:

"Ladies and Gentlemen, one of the issues that we have been addressing out of your presence and on the break has to do with testimony of this next witness, Ms. Berumen. I'm going to give you a limiting instruction. I told you about limiting instructions early on.

28

"Sometimes there will be evidence that is receivable only for a certain limited purpose, and you may hear some such evidence with respect to Ms. Berumen. Permit me to put this in context.

"As we all discussed during the voir dire process, and as you know and will be instructed, you are the judges of the facts. This means that you alone must judge the credibility or the believability of the witnesses. [¶] You will be instructed that in deciding whether testimony is true and accurate, you must use your common sense and experience. You must judge the testimony of each witness by the same standards—we talked about that, didn't we—setting aside any bias or prejudice that you might have.

"You may believe all or part or none of any witness's testimony. You are to consider the testimony of each witness and decide how much of it you believe.

"Now, in evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy about that testimony. We talked about that in voir dire.

"How well could the witness see? How well could the witness hear? How well does the witness remember? Does the witness answer the questions directly? Does the witness take the proceedings seriously? Does the witness have a bias or interest or motive that may cause a person to shade his or her testimony?

"Now, with respect to this next witness, Ms. Glennys Berumen, you may hear testimony that this witness has recently been threatened with bodily harm if she testifies

29

at this trial. This evidence is admitted only for the limited purpose of its possible effect on her credibility or believability.

"A witness who has been the subject of threats, if you find that to be the case, may behave differently on the witness stand than one who does not or has not.

"It will be up to you to evaluate this possibility along with the other evidence. It is of critical importance, however, that you not draw any negative conclusions about Mr. Dominguez because of this. There is no evidence that he was the source of threats.

"Instead, if you hear evidence that this witness was [threatened], you consider that in evaluating her believability. You must not use that evidence for any other purpose and you must not use it to infer that Mr. Dominguez is either guilty of those threats or guilty of the crime of which he's charged today."

The record shows the court then asked the jurors if they understood this limiting instruction, the jurors "all" gave an affirmative response and one of the jurors then asked whether they would learn who had threatened Glennys. In reply, the court reiterated the jury would not hear "any evidence that Mr. Dominguez told this person to go out and communicate these threats, and that is the link that [the court] want[s] to focus on here. [¶] You must not conclude that he must be guilty of count 1 or count 2 in this case, and you must not conclude that he must be responsible for the threats. You must consider the threat information only in terms of how it might affect this witness's believability."

30

b. Governing Law and Analysis

"'Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. [Citations.] An explanation of the basis for the witness's fear is likewise relevant to [his or] her credibility and is well within the discretion of the trial court. [Citations.]' [Citations.] '[T]here is no requirement to show threats against the witness were made by the defendant personally or the witness's fear of retaliation is "directly linked" to the defendant.' [Citations.]" (*People v. McKinnon* (2011) 52 Cal.4th 610, 668; see also *People v. Stewart* (2004) 33 Cal.4th 425, 492, fn. 28 [noting that evidence that a witness fears retaliation is admissible to assess his or her credibility, even when the threat is not directly linked to the defendant]; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1369 [noting the jury is "entitled to know not just that the witness was afraid, but also, within the limits of Evidence Code section 352, those facts which would enable them to evaluate the witness's fear"]; see also generally Evid. Code, § 780 [providing in part: "Except as otherwise provided by statute, the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing"].)

Moreover, evidence that a victim was threatened does not constitute hearsay because, as was the case here, it is admitted only to show the witness's state of mind. (See, e.g., *People v. Guerra* (2006) 37 Cal.4th 1067, 1142 ["evidence that [witness] feared retaliation for testifying against defendant was [properly] offered for the

nonhearsay purpose of explaining inconsistencies in portions of her testimony"], disapproved on other grounds as stated in *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

We conclude the trial court here properly exercised its discretion when it ruled to admit the threats to Glennys before she testified at trial, inasmuch as (i) the threats were clearly relevant to her credibility and believability as a witness, (ii) the threats were admitted for a nonhearsay purpose, (iii) the jury was instructed that it alone should decide whether the threats were even made, and (iv) the trial court gave a thorough and detailed limiting instruction to the jury that if it found the threats were made, it was not to draw any negative conclusions about Dominguez because there was no evidence he was behind or the source of the threats.

Indeed, as to this latter point, the record shows the court went so far as to ask the jurors if they understood the limiting instruction, noted for the record they all showed they did and answered the question of a juror by reiterating there was no link between the threats made against Glennys, on the one hand, and Dominguez, on the other hand.

We therefore conclude the court properly exercised its discretion in admitting evidence that Glennys was threatened before her trial testimony and feared retaliation for giving that testimony. (See *People v. McKinnon*, *supra*, 52 Cal.4th at pp. 670-671.)

3. *Admission of Josue's Statements to Carol Martinez Regarding Moises's Murder*

a. Additional Background

Carol Martinez testified as a defense witness. She said around 5:30 p.m. on the day Moises was killed, she, along with Josue, Moises and others were barbecuing in the

32

park. They left the park to take their belongings home before going to a quinceanera. Moises stayed behind. Before they left, Carol told police she saw Moises in the park with "Speedy" (i.e., Dominguez) and two other Shelltown gang members.

According to Carol, they could not find Moises when they returned to the park. Carol, along with Josue and several others, then went to the quinceanera that was held near the park. While at the party, someone said they heard gunshots. Josue was outside the party at that time. A few days after the killing, Carol testified she, Josue and two others went to the recreation center located in or near the park to determine whether Josue appeared on the center's video surveillance tape.

At sidebar, the defense contended statements made by Carol during a police interview were inadmissible. Specifically, Carol told police three days after the killing Josue had told her Moises was drinking in the park on the night of the murder, Moises and Speedy started arguing about Edwin's death, Speedy beat Moises causing Moises to bleed from the face and then Speedy shot Moises. The defense contended these statements constituted double hearsay and, in any event, were based on what Josue had heard.

After lengthy argument, the court admitted the statements Josue made to Carol that Carol relayed to police three days after the murder, ruling as follows:

"I think we need to consider this question in the context of a couple of relevant legal principles as well as in the factual context that this issue of evidence arises.

"The legal principles that seem appropriate for consideration are these: first, evidence that goes to the credibility of witnesses is relevant; secondly, all relevant evidence is admissible presumptively; third, that last rule is subject to the qualification of Evidence Code section 352. [¶] . . . [¶]

"Factually, I think we have to look at the fact that this issue arises in the context of a gang-related shooting, murder, where it is—where the evidence suggests perhaps even more than in the usual gang case a pretty concerted effort on the part of a number of people to obfuscate the truth and to deny what they saw.

"We've had evidence of threats to witnesses. We've had evidence of alibis. That's all fine. It's up to the jury to sort through that evidence. I think we now have evidence of attempts to create alibis.

"I have to say that certainly [defense counsel's] interpretation of the memorial that Josue wrote is one that can be argued.[9] It's not the only interpretation and frankly I think that another interpretation that can be argued is that the whole first part of that is a self-serving statement that in the context of this memorial, made after the police had

_____

9     A few days after his murder, several schoolmates of Moises made a poster for his family. Josue wrote the following on that poster: "Moises, I still remember that night like it was today. We were munching carne asada that we got from [the market]. We were going to go to the party right after but had to go drop off our things, and you decided to stay at the park and wait for us. Damn, when I came back, you were gone, and I looked all over for you, but you were nowhere to be found. [¶] Then I heard the gunshots. I never would have imagined it was you getting shot. Damn, I'm really going to miss you, fool. I'm going to miss those times after school chilling at the park with . . . friends and stuff. [¶] Well, I really don't know what else to say, but look for me . . . from up where you['re] at."

34

already leaned on him, Josue is trying to go on record as saying, 'I was as far away from you as I possibly could have been and wasn't there.'

"Now, that's just another interpretation that can be argued, and I expect both counsel will argue those competing interpretations in the context of all the evidence that we have in this case.

"The reason all of this is important, however, is this: we also have one witness, Glennys Berumen, who admittedly was fond of Moises, whose testimony directly impeaches Josue's about whether he was there or not that night. It will be up to the jury to decide the credibility of her statements and Josue's testimony.

"All of this is a backdrop to the issue that we have to consider right now and that is do I allow this line of examination by [the People] that would get into these statements that Carol Martinez variously says Jos[u]e told her that he heard or told her that he knew? To the extent that those might be rumors, I understand the defense's concern. It seems to me, though, that the law is that the court should not attempt to judge the credibility of witnesses in ruling on the admissibility of evidence. Obviously, there's some limitations to that . . . .

"It seems to me that the testimony that the district attorney seeks to proffer is relevant, is probative and, in fact, given the gang[-]related circumstances in which this case arises, has probative value that outweighs any prejudice or confusion or consumption of time.

35

"Defense counsel is free to argue that these were just rumors that Josue was repeating. I'll even give a limiting instruction to the effect that testimony that Josue told Carol Martinez certain details about the shooting, if the jury finds that that testimony was based on rumors that Josue had heard, then they must disregard it and not consider it for any reason, and if they find it was based on Josue's personal knowledge, then they may consider it and give it whatever weight it's entitled, something to that effect."

The record shows Carol testified she did not remember if Josue told her it was Speedy who beat and then shot Moises. Carol also said she did not make many of the statements attributed to her in the police report, she did not know whether her older brother was a member of the Shelltown gang who went by the moniker "Vandal," and she did not know Dominguez.

The record shows the trial court gave the jury the following limiting instruction at the conclusion of Carol's testimony:

"Sometimes evidence is received for a limited purpose. This is a variation on that notion. This notion is that sometimes evidence is received but you have to consider something before you're allowed to use it as evidence. [¶] Let me explain. You have heard testimony from Ms. Martinez, some of it by way of impeachment through statements reportedly made to the police, that Josue Gutierrez told Ms. Martinez certain details about the shooting of Moises.

"I don't wish to overly emphasize that testimony, but I want to have us focused on what I'm talking about. Those details include testimony regarding an argument about

36

blaming Moises for leaving . . . Little Crooks to die at that earlier shooting, statements about Speedy beating Moises, statements about Moises bleeding from his face and Speedy shooting him. I would like you to take that . . . testimony, and put it in a box, so to speak, subject to these rules.

"My instructions to you about that evidence is this: if you find in your deliberations, after considering all the evidence, that Josue did not have personal knowledge of those things, for example, that he was just repeating rumors that he had heard, you must not consider that evidence for any purpose; leave it in the box. However, if you find that Josue did see those things or otherwise had personal knowledge of them, then you may consider that evidence and give it whatever weight you believe it is enfiled [*sic*] to, you may give it the weight to which you think it should be given.

"So I've probably made this more complex than it needs to be. If you think it was Josue saying rumors that he had heard after you consider all the other evidence in this case, then don't consider it. If you think that it was based on his personal knowledge, then you may consider it.

"I see everybody nodding. Does everybody understand the instruction?"

The record shows an "unidentified juror" responded, "Yes."

In rebuttal, Homicide Detective Jana Beard testified she interviewed Carol three days after Moises's murder, and Carol told her then Josue had said Speedy beat Moises, causing Moises's face to bleed, and then Speedy shot Moises because Moises had left "Lil' Crooks" (i.e., Edwin) to die in an unrelated incident.

b. Governing Law and Analysis

As noted *ante*, evidence of a statement made by a witness is not inadmissible as hearsay if the statement is inconsistent with the witness's testimony at the hearing. (Evid. Code, § 1235.) Here, as noted *ante*, Josue testified he was not at the park at the time of the murder; he was not a member of the Shelltown gang; he did not know who killed his friend Moises; and he never said Speedy beat and then shot Moises. Carol also testified the police report containing the statements she allegedly made to police three days after the killing was inaccurate regarding what Josue had told her about the murder.

We conclude the trial court properly exercised its discretion under Evidence Code section 1235 when it ruled to admit (subject to a detailed and thorough limiting instruction) Carol's statements to police regarding what Josue had told her about the killing, inasmuch as these statements were inconsistent with the testimony given by *both* witnesses. (See *People v. Cowan* (2010) 50 Cal.4th 401, 462-463 [noting the abuse of direction standard of review applies to a court's ruling on the admission of evidence].)

4. *Exclusion of Alleged Prior Consistent Statement by Josue*

a. Additional Background

The defense called Josue as a witness. During his testimony, the defense sought to play the audiotape of a police interview of Josue four days after the killing that the defense claimed was "substantially similar" to Josue's trial testimony that, at the time of the shooting, he was not in the park but was instead at the quinceanera. Because the defense contended this recorded statement antedated Josue's statements to Glennys and

38

was consistent with his trial testimony, it was admissible as a prior consistent statement to rehabilitate Josue as a witness.

In order to be admissible, the trial court found the prior consistent statement had to predate any inconsistent statement and predate any motive to fabricate. It ruled to exclude the audiotape evidence based on the following chronology: Moises was killed September 13, 2008; the police interviewed Carol on September 16, 2008, where she gave "specific information" about the killing she learned from Josue; and the police interviewed Josue the day after they interviewed Carol, when Josue made the statement he was at the quinceanera and not in the park when Moises was killed.

b. Governing Law and Analysis

Under Evidence Code sections 791 and 1236, a prior consistent statement is admissible, notwithstanding the hearsay rule, if it is offered after an inconsistent statement is admitted to attack the testifying witness's credibility and if the consistent statement was made before the inconsistent statement. (Evid. Code, § 791, subd. (a).)[10]

Here, while it is true Josue's recorded statement to police he was not at the park at the time of the killing was made one day *after* the police interviewed Carol, it does not

---

[10] Evidence Code section 791 provides: "Evidence of a statement previously made by a witness that is consistent with his [or her] testimony at the hearing is inadmissible to support his [or her] credibility unless it is offered after: [¶] (a) Evidence of a statement made by him [or her] that is inconsistent with any part of his [or her] testimony at the hearing has been admitted for the purpose of attacking his [or her] credibility, and the statement was made before the alleged inconsistent statement; or [¶] (b) An express or implied charge has been made that his [or her] testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."

appear the court considered whether his recorded statement antedated the statements he made to Glennys (discussed *ante*), including that he saw Dominguez beat and shoot Moises.

The record shows there was a conflict in the evidence regarding when Josue made the statements to Glennys about Moises's death. As Dominguez notes, Glennys initially told police Josue made these statements to her sometime between May and July 2010. In that instance, Josue's recorded statement to police would have come before the inconsistent statements to Glennys and thus, arguably, would be admissible as a prior consistent statement. (See Evid. Code, § 791, subd. (a).)

However, when police interviewed Glennys in late February 2011, she told them Josue made these statements to her the day after the shooting. In that instance, Josue's recorded statement to police would have come after the inconsistent statements to Glennys and thus would be inadmissible as a prior consistent statement. (See Evid. Code, § 791, subd. (a).) At trial, Glennys testified Josue made the statements to her a "[s]hort period of time" after Moises's murder.

We need not decide whether the trial court abused its discretion and thus erred when it refused to admit Josue's recorded statement to police on September 17, 2008 that he was not in the park at the time of the shooting because we conclude that even if that statement was admissible under Evidence Code sections 791 and 1236, any error in excluding it was harmless.

The record contains ample evidence supporting the finding of the trial court there was a "concerted effort" by many individuals to obfuscate the truth and deny what they saw or knew about Moises's murder. Josue may well be one such individual, as he testified he was not a member of the Shelltown gang and was not known by the moniker "Scrappy"; he did not know Dominguez or that Dominguez went by the moniker "Speedy"; he did not know Glennys, despite the fact she was Moises's girlfriend for almost a year and Moises and Josue were, in Josue's own words, "close friends"; he did not know Glennys' brother, Humberto, who also at one time was a member of the Shelltown gang; and he never met or spoke to Glennys in the park about Moises's killing.

Furthermore, Glennys testified Josue was behind the threats made against her if she testified at the trial. Glennys said she was afraid to testify or "snitch" against the Shelltown gang and its members but did so because she wanted justice for Moises.

Given the trial testimony of Josue, which a reasonable jury could conclude was for "gang-related reasons" (See *People v. Cuevas* (1995) 12 Cal.4th 252, 277), when considered in light of his out-of-court statements as testified to by Glennys and Carol that clearly show Josue had some knowledge of the shooting and may have actually seen Dominguez shoot Moises, we conclude there is no reasonable probability the jury in this case would have reached a different result if the trial court had admitted into evidence Josue's self-serving, recorded statement to police four days after the murder that he allegedly was not in the park at the time of the killing. (See *People v. Watson* (1956) 46 Cal.2d 818, 836.)

5. *Competency of Andres to Testify at the Trial*

a. Additional Background

Dominguez moved pretrial to exclude Andres's testimony on the ground he was incompetent to testify pursuant to Evidence Code section 701, subdivision (a). The defense contended Andres was incompetent because he allegedly had a "very low" intelligence, made a number of inconsistent statements and had a difficult time understanding questions. The record shows the trial court deferred its ruling on Dominguez's request, but noted "[c]ompetency is a pretty low threshold, and the fact that a witness may not have a lot of horsepower or be a very articulate or organized witness usually isn't fatal. Those are questions for the jury to decide."

At the beginning of Andres's trial testimony, the record shows the trial court asked Andres a series of questions to test his competency as a witness. Those questions included his age, his level of education and whether he understood the difference between telling the truth and telling a lie. The record shows Andres answered these and many other questions to the satisfaction of the court, and it found him competent to testify.

b. Governing Law and Analysis

Under Evidence Code section 700, all witnesses are presumed competent. Evidence Code section 701, subdivision (a) creates an exception if the witness is "(1) [i]ncapable of expressing himself or herself concerning the matter so as to be understood, either directly or through interpretation by one who can understand him" or "(2) [i]ncapable of understanding the duty of a witness to tell the truth." A party challenging a

42

witness's competence has the burden of proof by a preponderance of the evidence, and the trial court's determination will be upheld in the absence of a clear abuse of discretion. (*People v. Lewis* (2001) 26 Cal.4th 334, 360.)

Our review of Andres's testimony, summarized *ante*, leads us to conclude the trial court did not abuse its discretion, much less clearly so, when it found him competent to testify. (See *People v. Lewis*, *supra*, 26 Cal.4th at p. 360.) The record shows the trial court—through its initial questioning of Andres—was satisfied Andres could distinguish between truth and falsity, and Andres understood the oath to tell the truth. We conclude these findings are supported by substantial evidence in the record, inasmuch as the record also shows Andres testified for a day and a half at Dominguez's retrial, was subject to extensive direct and cross-examination, and when Andres did not understand a question and/or was confused by it, he indicated as much.

That Andres gave inconsistent testimony and/or failed to remember certain aspects of the subject of the testimony does not mean he was incompetent to testify, as such matters "present questions of credibility for resolution by the trier of fact." (*People v. Mincey* (1992) 2 Cal.4th 408, 444; see also *People v. Lewis*, *supra*, 26 Cal.4th at pp. 360-361 [upholding the finding a witness was competent to testify despite the fact the witness suffered from "mental disorders," was "difficult to comprehend at times" and had the intellect of a seven year old because the record showed the witness was capable of communicating so as to be understood and because mere difficulty in understanding a witness and a witness's nonsensical or even unbelievable responses to certain questions

43

were an issue of credibility for the jury to decide and were not relevant to competency].) We thus conclude the trial court did not clearly abuse its discretion when it ruled Andres was competent to testify as a witness.

6. *Cross-Examination of Andres*

a. Additional Background

As noted *ante*, on retrial Andres testified there were lights on above the trees and near a bathroom in the park. The defense attempted to impeach Andres with his testimony from the first trial, when he was asked, "Where you were standing [in the park], there were no lights on, correct?" Andres responded, "Yes."

The trial court sua sponte suggested there was limited impeachment value in this line of questioning because the question from the first trial asked about the lighting from where Andres was standing, which the court noted was different than the questions about lighting asked of Andres on retrial. Because the court found there was a difference between the "where" and the "when" regarding Andres's testimony on this subject matter, it sustained its own objection to the question.

Next, the defense unsuccessfully attempted to impeach Andres based on his testimony in the retrial that on the night Moises was killed he saw Dominguez talking to gang members "Yogi" or "Crooks," but not both, with Andres's preliminary hearing testimony that he saw both Yogi and Crooks in the park that night. The defense contended Andres's prior testimony was subject to impeachment because Crooks was incarcerated on the day Moises was murdered.

44

Outside the presence of the jury, the court stated on the record it found Andres was not being evasive when he testified on retrial he could not remember whether Crooks was at the park when Moises was killed. In making this finding, the court noted that although competent, in its view Andres possessed the mental capacity of a five- or seven-year-old child when it came to understanding various concepts. The court further noted that Andres had been impeached myriad times by the defense during cross-examination and that from that point forward it intended to "place some limits on what we might call traditional impeachment methods" of Andres in light of his cognitive and memory issues.

b. Governing Law and Analysis

"'[T]he right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal. Indeed, . . . to deprive an accused of the right to cross-examine the witnesses against him is a denial of the Fourteenth Amendment's guarantee of due process of law.' [Citation.]" (*People v. Brown* (2003) 31 Cal.4th 518, 538.) "The constitutional right of confrontation includes the right to cross-examine adverse witnesses on matters reflecting on their credibility." (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 841-842.) "As the high court has explained, cross-examination is required in order 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.' [Citation.]" (*People v. Smith* (2007) 40 Cal.4th 483, 513.)

However, "not every restriction on a defendant's cross-examination rises to a constitutional violation." (*People v. Singleton* (2010) 182 Cal.App.4th 1, 18.) "The right

of confrontation is not absolute . . . 'and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.' [Citation.]" (*Alvarado v. Superior Court* (2000) 23 Cal.4th 1121, 1138–1139; see also *Taylor v. Illinois* (1988) 484 U.S. 400, 410.)

"'[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.' [Citations.] Exclusion of impeaching evidence on collateral matters which has only slight probative value on the issue of veracity does not infringe on the defendant's right of confrontation." (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 350; see also *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679.)

"In particular, notwithstanding the confrontation clause, a trial court may restrict cross-examination of an adverse witness on the grounds stated in Evidence Code section 352." (*People v. Quartermain* (1997) 16 Cal.4th 600, 623.) "'[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. [Citation.]' [Citations.] . . . [Thus,] a trial court may restrict cross-examination on the basis of the well-established principles of Evidence Code section 352, i.e., probative value versus undue prejudice. [Citation.] There is no Sixth Amendment violation at all unless the prohibited cross-examination might reasonably have produced a significantly different

impression of credibility." (*People v. King* (2010) 183 Cal.App.4th 1281, 1314-1315, fn. omitted.)

Here, as noted *ante*, Andres was subject on retrial to a lengthy and vigorous cross-examination and recross-examination by the defense. The record supports the finding of the trial court that Andres had difficulty understanding and responding to certain questions, including those requiring him to contemplate statements he made at different times, in multiple proceedings, to various people, which difficulty, the record shows, grew worse as his cross-examination progressed. The record also supports the finding of the trial court that Andres repeatedly was impeached by the defense during cross-examination.

We therefore conclude the trial court properly exercised its discretion when, towards the end of Andres's lengthy cross-examination in Dominguez's retrial, it limited that cross-examination. (See *People v. Feaster* (2002) 102 Cal.App.4th 1084, 1091-1092 [noting a court abuses its discretion in limiting cross-examination when "'the resulting injury [is] sufficiently grave to manifest a miscarriage of justice'"]; see also *People v. Greenberger*, *supra*, 58 Cal.App.4th at p. 350 [noting the "determination whether a defendant has been denied the right of confrontation is focused on the individual witness"].)

In any event, given the showing in the record that Andres was repeatedly impeached by the defense, we conclude any alleged error in limiting his lengthy cross-examination was harmless. (See *People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

7. *Admission of Prior Identification of Andres*

a.  Additional Background

As noted *ante*, Natalie Elias testified she went outside after she heard gunfire coming from the park.  Natalie saw two people running out of the park.  In the first trial, Natalie identified Andres as one of the two people she saw running that night.

During her testimony at the retrial, the court instructed the jury in part as follows regarding Natalie's previous identification of Andres:

"At a previous court appearance when Ms. Elias testified, she was asked if, after she gave part of her testimony and walked outside, she saw outside the courtroom the person that she had the confrontation with that night, and she said that she believed she did.  That person was brought into the courtroom.  [¶]  Ms. Elias was back on the stand and she was asked—she was shown the young man.  The young man was Andres . . . . And she was asked, 'What can you tell us about this individual?'

"And she said, 'That looks like the boy I saw.'

"She was asked, 'What about him indicates to you it is the boy you saw?'

"She said, 'That face.  He looks really young for his age.'

"She was asked, 'Do you recognize his face?'

"And she answered, 'Yes.'

"She was asked, 'Is it the same face that you saw of the person that you testified to today?'

"And she said, 'Yes sir.'

"The reason I'm giving this to you in this fashion is that . . . Andres . . . is not present at this court hearing right now to be shown to this witness. I'm satisfied that this is admissible former testimony to that fact.

"Ma'am, do you remember those statements?

"THE WITNESS: Yes, sir.

"THE COURT: And did you testify truthfully then?

"THE WITNESS: Yes, sir.

"THE COURT: All right. Thank you."

Dominguez contends the trial court erred during retrial when it admitted, under Evidence Code section 1238, subdivision (b), Natalie's identification of Andres from the first trial because there was no direct evidence that her observation of Andres on the night of the murder was "fresh" in her mind when she testified at the first trial, more than two years after the killing.

b. Governing Law and Analysis

Prior identifications may be admissible as an exception to the general ban on hearsay pursuant to Evidence Code section 1238, which provides:

"Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement would have been admissible if made by him while testifying and:

"(a) The statement is an identification of a party or another as a person who participated in a crime or other occurrence;

49

"(b) The statement was made at a time when the crime or other occurrence was fresh in the witness' memory; and

"(c) The evidence of the statement is offered after the witness testifies that he made the identification and that it was a true reflection of his opinion at that time."

As we noted *ante*, a trial court is afforded wide latitude in determining whether evidence is admissible as an exception to the hearsay rule. (*People v. Edwards* (1991) 54 Cal.3d 787, 820.) The foundation, or preliminary fact, requires proof by a preponderance of the evidence (*People v. Anthony O.* (1992) 5 Cal.App.4th 428, 433) and whether that foundation has been laid will not be disturbed on appeal absent an abuse of discretion. (*People v. Gutierrez* (2000) 78 Cal.App.4th 170, 177-178.)

The record here shows no hesitation by Natalie in identifying Andres in the first trial as the young man she saw in her yard on the night of the killing. In fact, it was Natalie who spoke up and told an investigator and the prosecutor after her testimony had concluded that she believed the young man in the courthouse was the same person she saw in her yard that night.

The record also shows Natalie was cross-examined in both trials regarding her identification of Andres. Natalie testified on cross-examination in the first trial that on the night of the killing her entire yard was illuminated when she saw the young man jump the fence into her yard. Natalie saw his face for about five seconds, while he pleaded with her to let him hide in her yard. After she finished testifying she saw the

50

young man in the hallway of the courthouse and "right away . . . noticed [his] face," including his nose, which she described as "kind of big. . . ."

During cross-examination in the retrial, Natalie similarly testified that after she completed testifying in the first trial, she walked out of the courtroom and saw a young man whom she believed was the same person she saw in her yard on the night Moises was killed. Natalie reiterated she recognized the young man by his face, among other attributes.

In light of this evidence, the fact Natalie was under oath in the first trial when she made the original identification of Andres, as sworn by her again under oath in the second trial, and the fact that she was subject to cross-examination in both trials regarding her identification of Andres, we conclude the trial court did not err in tacitly finding that her identification of Andres was sufficiently reliable to satisfy the freshness requirement in subdivision (b) of Evidence Code section 1238. (See *People v. Miller* (1996) 46 Cal.App.4th 412, 424 [emphasizing that a witness need not say the "'magic words'" that a statement was recorded at a time the information was "fresh" in his or her mind for purposes of subdivision (a)(1) of Evidence Code section 1237—the "past recollection recorded" exception to the hearsay rule—as long as the court had sufficient basis for determining that the statement was reliable and emphasizing that reliability was enhanced by the defendant's opportunity to cross-examine vigorously the hearsay declarant at trial], disapproved on other grounds as stated in *People v. Cortez* (1998) 18 Cal.4th 1223, 1239-1240.)

51

In any event, we further conclude that any error was harmless in admitting

Natalie's prior identification of Andres.  (See *People v. Watson*, *supra*, 46 Cal.2d at p.

836.)  The record shows Andres himself testified on retrial he was in the park at the time

of the shooting and, immediately after the shooting, he ran through the yards of houses

and hid in a sewer.  Carol also testified Josue told her "Stalker" (i.e., Andres) was in the

park when Moises was killed.  We therefore conclude it was not reasonably probable that

the jury would have reached a result more favorable to Dominguez had Natalie's prior

identification of Andres been excluded from evidence.  (See *ibid.*)

C. *Trial Court's Response to a Jury Question*

1. *Additional Background*

The jury asked the following question during its deliberations:  "Does the

defendant have to be the one who actually pulled the trigger in order for him to be guilty

of Count 1, murder?"

The record shows the jury had been instructed with CALCRIM No. 563[11]

(conspiracy to commit murder), and not with CALCRIM No. 415[12] (conspiracy to

_____

[11]     The jury was instructed as follows with a modified version of CALCRIM No. 563:
        "The defendant is charged in Count Two with conspiracy to commit murder in
violation of Penal Code section 182.  [¶]  To prove that the defendant is guilty of this
crime, the People must prove that:  [¶]  1.  The defendant intended to agree and did agree
with one or more unidentified co-conspirators to intentionally and unlawfully kill;  [¶]  2.
At the time of the agreement, the defendant and one or more of the other alleged
members of the conspiracy intended that one or more of them would intentionally and
unlawfully kill;  [¶]  3.  The defendant, or unidentified co-conspirators, or all of them
committed at least one of the following overt acts alleged to accomplish the killing:  [¶]
OVERT ACT NO. (01):  Two unidentified co-conspirators met up with [the defendant] in
the park;  [¶] OVERT ACT NO. (02):  [The defendant] or one of the two unidentified co-
conspirators produced a handgun;  [¶]  OVERT ACT NO. (03):  [The defendant] or one

52

of the two unidentified co-conspirators walked over to Moises Lopez; [¶] OVERT ACT NO. (04): [The defendant] or one of the two unidentified co-conspirators aimed the handgun at Moises Lopez; [¶] OVERT ACT NO. (05): [The defendant] or one of the two unidentified co-conspirators fired the handgun at Moises Lopez; [¶] OVERT ACT NO. (06): [The defendant] or one of the two unidentified co-conspirators fired the handgun at Moises Lopez a second time; [¶] OVERT ACT NO. (07): [The defendant] or one of the two unidentified co-conspirators fired the handgun at Moises Lopez a third time; [¶] OVERT ACT NO. (08): [The defendant] or one of the two unidentified co-conspirators fired the handgun at Moises Lopez a fourth time; [¶] OVERT ACT NO. (09): [The defendant] or one of the two unidentified co-conspirators fired the handgun at Moises Lopez a fifth time; [¶] OVERT ACT NO. (10): [The defendant] and the two unidentified co-conspirators ran away from the scene to avoid being arrested by the police; [¶] AND [¶] 4. At least one of these overt acts was committed in California. [¶] To decide whether the defendant committed an overt act, consider all of the evidence presented about the overt acts. [¶] To decide whether the defendant and one or more of the other alleged members of the conspiracy intended to commit murder, please refer to the Instructions which define that crime. [¶] The People must prove that the members of the alleged conspiracy had an agreement and intent to commit murder. The People do not have to prove that any of the members of the alleged conspiracy actually met or came to a detailed or formal agreement to commit that crime. An agreement may be inferred from conduct if you conclude that members of the alleged conspiracy acted with a common purpose to commit the crime. [¶] An *overt act* is an act by one or more of the members of the conspiracy that is done to help accomplish the agreed upon crime. The overt act must happen after the defendant has agreed to commit the crime. The overt act must be more than the act of agreeing or planning to commit the crime, but it does not have to be a criminal act itself. [¶] You must all agree that at least one alleged overt act was committed in California by at least one alleged member of the conspiracy, but you do not have to all agree on which specific overt act or acts were committed or who committed the overt act or acts. [¶] A member of a conspiracy does not have to personally know the identity or roles of all the other members. [¶] Someone who merely accompanies or associates with members of a conspiracy but who does not intend to commit the crime is not a member of the conspiracy. [¶] Evidence that a person did an act or made a statement that helped accomplish the goal of the conspiracy is not enough, by itself, to prove that the person was a member of the conspiracy."

CALCRIM No. 415 provides:

"[I have explained that (the/a) defendant may be guilty of a crime if (he/she) either commits the crime or aids and abets the crime. (He/She) may also be guilty if (he/she) is a member of a conspiracy.] [¶] (The defendant[s]/Defendant[s] *<insert name[s]>*) (is/are) charged [in Count ___] with conspiracy to commit *<insert alleged crime[s]>* [in violation of Penal Code section 182]. [¶] To prove that (the/a) defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant intended to agree and did agree

53

commit a crime).  The trial court noted the following bracketed language in CALCRIM

No. 415 was *not* included in CALCRIM No. 563:  "I have explained that (the/a)

---

with [one or more of] (the other defendant[s]/ [or] *<insert name[s] or description[s] of coparticipant[s]>*) to commit *<insert alleged crime[s]>*;  [¶]  2.  At the time of the agreement, the defendant and [one or more of] the other alleged member[s] of the conspiracy intended that one or more of them would commit *<insert alleged crime[s]>*; [¶]  3.  (The/One of the) defendant[s][,] [or *<insert name[s] or description[s] of coparticipant[s]>*][,] [or (both/all) of them] committed [at least one of] the following alleged overt act[s] to accomplish *<insert alleged crime[s]>*: *<insert the alleged overt acts>*;  [¶]  AND  [¶]  4.  [At least one of these/This] overt act[s] was committed in California.  [¶]  To decide whether (the/a) defendant committed (this/these) overt act[s], consider all of the evidence presented about the act[s].  [¶]  To decide whether (the/a) defendant and [one or more of] the other alleged member[s] of the conspiracy intended to commit *<insert alleged crime[s]>*, please refer to the separate instructions that I (will give/have given) you on (that/those) crime[s].  [¶]  The People must prove that the members of the alleged conspiracy had an agreement and intent to commit *<insert alleged crime[s]>*. The People do not have to prove that any of the members of the alleged conspiracy actually met or came to a detailed or formal agreement to commit (that/one or more of those) crime[s]. An agreement may be inferred from conduct if you conclude that members of the alleged conspiracy acted with a common purpose to commit the crime[s].  [¶]  An *overt act* is an act by one or more of the members of the conspiracy that is done to help accomplish the agreed upon crime.  The overt act must happen after the defendant has agreed to commit the crime.  The overt act must be more than the act of agreeing or planning to commit the crime, but it does not have to be a criminal act itself.  [¶]  [You must all agree that at least one alleged overt act was committed in California by at least one alleged member of the conspiracy, but you do not have to all agree on which specific overt act or acts were committed or who committed the overt act or acts.]  [¶]  [You must make a separate decision as to whether each defendant was a member of the alleged conspiracy.]  [¶]  [The People allege that the defendant[s] conspired to commit the following crimes: *<insert alleged crime[s]>*.  You may not find (the/a) defendant guilty of conspiracy unless all of you agree that the People have proved that the defendant conspired to commit at least one of these crimes, and you all agree which crime (he/she) conspired to commit.]  [You must also all agree on the degree of the crime.]  [¶]  [A member of a conspiracy does not have to personally know the identity or roles of all the other members.]  [¶]  [Someone who merely accompanies or associates with members of a conspiracy but who does not intend to commit the crime is not a member of the conspiracy.]  [¶]  [Evidence that a person did an act or made a statement that helped accomplish the goal of the conspiracy is not enough, by itself, to prove that the person was a member of the conspiracy.]"

54

defendant may be guilty of a crime if (he/she) either commits the crime or aids and abets the crime. (He/She) may also be guilty if (he/she) is a member of a conspiracy."

The record also shows the court and counsel agreed CALCRIM No. 563 was the proper instruction to give the jury in this case, inasmuch as the bench notes for this instruction state it is to be used when "the defendant is charged with conspiracy to commit murder," as in the instant case, and further state CALCRIM No. 415 is to be used when "the defendant is charged with conspiracy to commit another crime . . . ." (Judicial Council of Cal., Crim. Jury Instns. (2013) Bench Notes to CALCRIM No. 563, p. 349.) The court and counsel also agreed CALCRIM No. 563 was a correct statement of the law.

The prosecutor asked the court to instruct the jury further as follows: "A defendant can be guilty of murder either as a direct perpetrator or as a co-conspirator." The prosecutor contended this short, supplemental instruction was a "correct statement of law. It doesn't run afoul of anything. It doesn't come as a surprise to anybody seeing that that's what the arguments were completely geared towards from day one in this case and what happened in summations . . . ."

The defense admitted the instruction proposed by the prosecution was generally a correct statement of the law but nonetheless argued the defendant would be prejudiced if the court gave the supplemental instruction because the defense allegedly had not focused on conspiracy to commit murder.

The trial court found the defense had vigorously argued the conspiracy count and therefore ruled it was unnecessary to reopen argument of counsel as it did not think "there [was] much that could be said other than to emphasize that to find a person liable as a co-conspirator, they [the jury] have to find conspiracy proven."

After additional input from both counsel, the trial court proposed giving the following supplemental instruction: "A defendant may be found guilty of a crime if he either personally commits the crime or if he is a member of a conspiracy to commit that crime and the intended crime is, in fact, committed by another member of the conspiracy. In order for a defendant to be found guilty of a crime by virtue of being a member of a conspiracy to commit that crime, each of the elements of the conspiracy to commit that crime must be proved beyond a reasonable doubt."

At the suggestion of the defense, the trial court changed a portion of its proposed supplemental instruction. The trial court then gave the jury the following supplemental instruction: "A defendant may be found guilty of a crime if he either personally commits the crime or if he is a member of a conspiracy to commit that crime and the intended crime is in fact committed by another member of the conspiracy. In order for a defendant to be found guilty of a crime by virtue of being a member of a conspiracy to commit that crime, each of the elements of the conspiracy to commit that crime as set forth in instruction CALCRIM No. 563 must be proved beyond a reasonable doubt."

2. *Governing Law and Analysis*

It is the primary duty of the trial court to "help the jury understand the legal principles it is asked to apply." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.) Section 1138 provides in part: "After the jury ha[s] retired for deliberation[s], . . . if [it] desire[s] to be informed on any point of law arising in the case [it] must [be] . . . brought into court [and] . . . the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his [or her] counsel . . . ."

"Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. [Citation.]" (*People v. Beardslee*, *supra*, 53 Cal.3d at p. 97.) However, "a court must do more than figuratively throw up its hands and tell the jury it cannot help. It must at least *consider* how it can best aid the jury." (*Ibid.*)

Dominguez contends the trial court violated his right to counsel and due process, *not* because it gave the supplemental instruction to the jury on what admittedly was a correct statement of the law, but because it refused to reopen closing argument to allow the defense an additional opportunity to argue what it contends was a "new conspiracy theory of murder . . . ." We conclude the record does not support this contention, and the trial court properly exercised its discretion when it refused to reopen argument after it gave the supplemental instruction to the jury.

57

Initially, we note the information charged Dominguez with murder *and* conspiracy to commit murder. In addition, the defense clearly was on notice before the retrial commenced of the People's theory that Dominguez could be found guilty of murder under a conspiracy theory as evidenced by its unsuccessful motion in limine to prevent the People from presenting "alternative theories of guilt," which theories the defense noted were that Dominguez was the shooter and that Dominguez was "not the shooter but conspired with the shooter to commit murder." Moreover, in oral argument on this in limine motion, the defense begrudgingly agreed Dominguez could be guilty of murder as the shooter and/or as a co-conspirator of the shooter "under the conspiracy doctrine."[13]

In addition, the record shows the prosecutor in both opening and closing argument contended Dominguez could be guilty of murder as a coconspirator. Specifically, during closing argument, the prosecutor contended each of the three individuals who took part in the severe beating of Moises and then discussed what they would do with the victim was as guilty as the triggerman for Moises's murder because "practically and legally speaking . . . it doesn't matter whose finger is on that trigger, because each and every one of them helped pull it." And, as noted *ante*, the jury was given the standard instruction for conspiracy to commit murder, CALCRIM No. 563.

---

[13] We say "begrudgingly" because although defense counsel agreed the law allowed the People to argue different theories—including Dominguez was the shooter and/or was a coconspirator of the shooter—in support of a murder conviction, defense counsel stated this "shouldn't" be the law and, in his view, it was "ethically reprehensible" for a prosecutor to make such an argument and obtain a conviction when "'[t]he prosecutor doesn't even know what happened . . . .'"

Dominguez, however, relies on the Ninth Circuit's opinion *Sheppard v. Rees* (9th Cir. 1989) 909 F.2d 1234 to support his contention there was due process error.  We conclude *Sheppard v. Rees* is inapposite because unlike here, the prosecutor there "'ambushed' the defense with a new theory of culpability [i.e., felony murder based on the *uncharged* crime of robbery] after the evidence was already in, after both sides had rested, and after the jury instructions were settled." (*Id.* at p. 1237.)  Clearly, the circumstances in *Sheppard v. Rees* are much different than those in the case at bar, where the record shows Dominguez was charged with conspiracy to commit murder and was aware of that "theory of culpability" even before his retrial commenced.

For similar reasons, we reject Dominguez's contention that his case is similar to the circumstances presented in *United States v. Gaskins* (9th Cir. 1988) 849 F.2d 454. There, the defendant was convicted of possessing and manufacturing methamphetamine. The jury was not instructed on aiding and abetting principles prior to closing arguments. In response to a question from the jury, the district court provided an aiding and abetting instruction over the defense's objection and denied the defense's request to reopen closing argument.  (*Id.* at pp. 456–457.)  The United States Court of Appeals for the Ninth Circuit reversed, explaining that "the district judge's decision to give the aiding and abetting instruction during jury deliberations, after initially stating . . . that [the court] would not, unfairly prevented [the defense] from arguing against an aiding and abetting *theory* to the jury." (*Id.* at p. 460.)

Here, unlike the situation in *United States v. Gaskins*, there was no new "theory of culpability" introduced during the jury's deliberations. Rather, as noted *ante*, even before his retrial commenced, Dominguez was on notice of the People's theory he could be found guilty of Moises's murder as a coconspirator of a conspiracy.

In addition, unlike the facts of *United States v. Gaskins*, the jury here was properly instructed with the standard conspiracy to commit murder instruction *before* closing argument and jury deliberations. As such, unlike the situation in *United States v. Gaskins* when the district court refused to reopen closing argument, the court in the instant case did not prevent the defense from arguing in closing against this "theory of culpability." (See *People v. Ardoin* (2011) 196 Cal.App.4th 102, 133-134 [noting that to the extent defense counsel "may not have argued against felony-murder liability in as much detail as he, upon subsequent reflection, would have liked, . . . defense counsel knew the issue had been presented and took the opportunity to vigorously contest it" and noting the "right to due process guarantees an opportunity for effective presentation of a defense, not the presentation of a defense that is as effective as a defendant might prefer"].)

Clearly, the defense in the instant case had ample time to tailor its closing argument to address (or not) the theory Dominguez was guilty of murder under a conspiracy theory. (Cf. *Gray v. Raines* (9th Cir. 1981) 662 F.2d 569, 570, 573-574 [concluding district court erred when it instructed on statutory rape at the close of evidence because the defendant had only been charged with forcible rape and thus the

60

defendant had convicted himself after testifying he had consensual intercourse with a 17 year old].)

Lastly, the record shows before the trial court decided to give the supplemental instruction, it inquired of the defense how it would have argued conspiracy differently if the jury had been given the supplemental instruction prior to closing argument.  Defense counsel responded as follows:

"Well, it would have focused more on the conspiracy in that this conspiracy as to—in order—well, because basically the statement of the law is actually—given by the prosecutor is actually incomplete, because before the defendant can be found guilty of murder based on a theory of conspiracy, the theory of conspiracy has to be proven beyond a reasonable doubt.  So I think if we are to instruct them, that has to be clear, that they can't just think there might be a conspiracy and convict of murder.  It has to be conspiracy beyond a reasonable doubt.  [¶] . . . [¶]

"So, again, I mean opening it up for argument, the argument would change as to, sure, co-conspirators are liable for the conspirators' crimes when it is the target crime, but only if the conspiracy has been proven beyond a reasonable doubt.  And I would have definitely focused on that more."

However, as noted *ante*, the trial court included the defense's suggestion to add language to the supplemental instruction informing the jury it could not convict Dominguez of murder under a conspiracy theory unless it found each of the elements of

61

the conspiracy set forth in instruction CALCRIM No. 563 "proved beyond a reasonable doubt."

Thus, the record shows the very concerns expressed by the defense for the need to reopen argument were incorporated into the supplemental instruction itself. (See *People v. Ardoin*, *supra*, 196 Cal.App.4th at pp. 129-131 [concluding a supplemental instruction to the jury introduced new matter for consideration by the jury but also concluding the defendant was not prejudiced by it because the defendant was on notice of his potential culpability under the felony-murder rule as an aider and abetter in light of the first degree murder charge against him and the evidence adduced at his trial and as a result of the overwhelming evidence in the record of "defense counsel's awareness . . . that felony-murder and aiding-and-abetting principles were at issue in the case"].)

In short, we conclude Dominguez was not ambushed by the carefully-crafted supplemental instruction and was not prejudiced by the court's decision not to reopen closing argument.

D. *Cumulative Error*

Finally, Dominguez contends that the cumulative effect of all the errors he raised denied him a fair trial. However, because "[w]e have either rejected on the merits defendant's claims of error or have found any assumed errors to be nonprejudicial" (*People v. Sapp* (2003) 31 Cal.4th 240, 316), we reject Dominguez's claim of prejudicial cumulative effect. (See *People v. Whalen* (2013) 56 Cal.4th 1, 92 [noting that in finding

62

only one error and, in finding that error harmless under any standard, the defendant's cumulative error claim fails].)

## DISPOSITION

The judgment of conviction is affirmed.


BENKE, Acting P. J.

I CONCUR:


HALLER, J.